ORIGINAL

1   **SCHEPER KIM & HARRIS LLP**
    MARC S. HARRIS (State Bar No. 136647)
2   mharris@scheperkim.com
    MIRANDA LIEVSAY (State Bar No. 327308)
3   mlievsay@scheperkim.com
    800 West Sixth Street, 18th Floor
4   Los Angeles, California 90017-2701
    Telephone: (213) 613-4655
5   Facsimile:  (213) 613-4656

6   **KRIEGER KIM & LEWIN LLP**
    NICHOLAS J. LEWIN *[Pro Hac Vic Application Pending]*
7   nick.lewin@kklllp.com
    JONATHAN L. BODANSKY *[Pro Hac Vic Application Pending]*
8   jon.bodansky@kklllp.com
    500 Fifth Avenue, 34th Floor
9   New York, NY 10110
    Telephone: (212) 390-9550

10  Attorneys for Relators

11

12                UNITED STATES DISTRICT COURT

13              SOUTHERN DISTRICT OF CALIFORNIA

14

15  UNITED STATES OF AMERICA *ex*      CASE NO. **'20 CV 0223 MMA MDD**
    *rel.* JOHN DOE-1 AND JOHN DOE-2,
16
              Plaintiffs,              **TO BE FILED IN CAMERA AND**
17                                     **UNDER SEAL**
          v.
18
    SULLIVAN LAND SERVICES CO.         **QUI TAM RELATORS' FALSE**
19  LTD., d/b/a "SLS," d/b/a "SLSCO    **CLAIMS ACT COMPLAINT**
    LTD.," and ULTIMATE CONCRETE
20  OF EL PASO, LLC, d/b/a
    "ULTIMATE CONCRETE LLC,"
21
              Defendants.
22

23

24

25

26

27

28

1.     John Doe-1 ("Relator-1") and John Doe-2 ("Relator-2," and together with Relator-1, the "Relators"),[1] by and through their undersigned attorneys, Krieger Kim & Lewin LLP and Scheper Kim & Harris LLP, bring this action on behalf of the United States of America ("U.S.") against SULLIVAN LAND SERVICES CO. LTD., d/b/a "SLS," d/b/a "SLSCO Ltd." ("SLS"), and ULTIMATE CONCRETE OF EL PASO, LLC, d/b/a "Ultimate Concrete LLC" ("UC," and together with SLS, "Defendants"), for treble damages and civil penalties arising from Defendants' conduct in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA"). The violations arise out of Defendants' apparently fraudulent requests for payment presented to, or caused to be presented directly or indirectly to, the U.S. Department of the Army, Army Corps of Engineers (the "USACE"), in connection with various projects related to the repair and construction of a border wall on the U.S.-Mexico border in the states of California, New Mexico and Texas (the "Border Wall Projects").

2.     Specifically, as set forth in detail herein, Defendants violated the FCA in myriad ways, including, but not limited to, presenting false claims for payment and approval, and making, using and causing to be made or used false records or statements material to such false or fraudulent claims and approvals, based on, *inter alia*, the following:

    a.     Overcharging for services provided to the USACE in connection

---

[1] In light of the subject matter of this complaint, including allegations of violence and, effectively, weapons trafficking, and the law-enforcement background of the Relators, this complaint is being filed anonymously in the first instance, accompanied by a motion requesting the same. "When a party requests 'Doe' status, the factors to be 'balance[d] . . . against the general presumption that parties' identities are public information,' are: '(1) the severity of the threatened harm; (2) the reasonableness of the anonymous party's fears; and (3) the anonymous party's vulnerability to such retaliation.'" *Doe v. Ayers*, 789 F.3d 944, 945 (9th Cir. 2015) (citation omitted). For the reasons set forth in the accompanying motion, those factors weigh heavily in favor of anonymity here. The identities of Relator-1 and Relator-2 have been and/or will be provided to the relevant U.S. government authorities, pursuant to 31 U.S.C. § 3730(b)(2).

1    with the Border Wall Projects;

2          b.    Knowingly permitting and actively facilitating the crossing of the
3    U.S.-Mexico border by armed Mexican nationals, into the United States, in violation
4    of federal laws, and making false claims and representations regarding the same;

5          c.    Knowingly permitting the use of unvetted workers in sensitive
6    and lightly secured areas in the immediate vicinity of the U.S.-Mexico border, and
7    making false claims and representations regarding the same; and

8          d.    Failing to report, and falsely reporting, incidents to the USACE
9    and other U.S. government agencies, as required under the relevant contracts.

10         3.    As required by the FCA, 31 U.S.C. § 3730(b)(2), the Relators have
11   provided, and/or will provide, to the Attorney General of the United States and to the
12   United States Attorney for the Southern District of California, simultaneous with or
13   prior to the filing of this complaint, written disclosure of substantially all material
14   evidence and information possessed by and/or known to the Relators at the time of
15   this filing. Because the disclosure includes attorney-client communications and work
16   product of the Relators' attorneys, and is submitted to the Attorney General and to
17   the United States Attorney in their capacity as potential co-counsel in this litigation,
18   the Relators understand the disclosure to be confidential.

19                              **PARTIES**

20         4.    Relator-1 is an employee of a nationwide provider of private security
21   services (the "Security Firm"), which was contracted by SLS to provide security
22   services in connection with certain of the Border Wall Projects.

23         a.    Specifically, from May 2019 through December 2019, Relator-1
24   was the Onsite Security Manager (under the auspices of the Security Firm) for two of
25   the California-based Border Wall Project sites, and he was involved in a more limited
26   capacity in a third.

27         b.    Relator-1 served for approximately a decade as a Deputy Sheriff
28   with the San Diego County Sheriff's Department.

c.    As set forth in detail below, Relator-1 has direct and original information and knowledge of the allegations contained herein, based on his personal involvement in the Border Wall Projects.

d.    Relator-1 brings this action based on his direct and original information and knowledge, and also on information and belief.

e.    None of the actionable allegations set forth in this complaint are based on a public disclosure, as set forth in 31 U.S.C. § 3730(e)(4).

f.    Relator-1, along with Relator-2, is an original source of the facts alleged in this complaint.

g.    In or about November 2019, in coordination with Relator-2, Relator-1 met with U.S. Federal Bureau of Investigation ("FBI") Special Agents and shared information regarding Defendants' involvement in certain of the apparently unlawful activities described herein.  Relator-1 then had additional conversations with multiple FBI Special Agents on or about December 4 and 5, 2019, and thereafter.

5.    Relator-2 was contracted by SLS as its overall Security Manager for the Border Wall Projects, commencing in approximately January 2019 and continuing until he was terminated – evidently, upon information and belief, in relation to his refusal to permit the activities set forth herein – in approximately November 2019.

a.    In that capacity, Relator-2 worked closely with the Security Firm and Relator-1.

b.    Relator-2 is a former FBI Supervisory Special Agent, with nearly thirteen years of experience with the FBI as an Agent.  Among other responsibilities, Relator-2 served as a Special Agent on a public corruption squad in Washington, DC.  Relator-2 served in a variety of other roles domestically and overseas relating to national security.  Relator-2 has received specialized training relating to, *inter alia*, the investigation of federal government corruption.

c.    As set forth in detail below, Relator-2 has direct and original information and knowledge of the allegations contained herein, based on his personal

1   involvement in the Border Wall Projects.

2          d.      Relator-2 brings this action based on his direct and original
3   information and knowledge, and also on information and belief.

4          e.      None of the actionable allegations set forth in this complaint are
5   based on a public disclosure, as set forth in 31 U.S.C. § 3730(e)(4).

6          f.      Relator-2, along with Relator-1, is an original source of the facts
7   alleged in this complaint.

8          g.      On or about July 24, 2019, Relator-2 made initial contact with the
9   FBI in order to report Defendants' involvement in the apparently unlawful activity
10  described herein.  Thereafter, beginning on or about August 5, 2019, Relator-2 had
11  multiple discussions with multiple FBI Supervisory Special Agents and at least three
12  FBI Special Agents about the same, and provided numerous documents and other
13  communications to the Agents regarding the same.

14  6.      Defendant SLS is a business founded in or about 1995, focused on
15  general contracting and program and construction management.

16         a.      SLS provides construction services to federal, state and local
17  governments, as well as to private companies.

18         b.      SLS is headquartered in Galveston, Texas, with offices in
19  Houston, New Orleans, New York, Charleston and the Caribbean Basin, but it does
20  business throughout the U.S.

21         c.      SLS serves as the prime contractor for at least five contracts
22  relating to the Border Wall Projects: two within the geographic boundaries of the
23  Southern District of California; one in New Mexico; and two in Texas.

24  7.      Defendant UC is a business founded in or about 2012, focused on
25  providing a variety of construction services.

26         a.      UC is headquartered in El Paso, Texas.

27         b.      UC was hired by SLS to serve as a subcontractor providing
28  construction services in connection with the Border Wall Projects.

1    8.    At all times relevant hereto, Defendants acted through their agents and

2    employees, and the acts of Defendants' agents and employees were within the scope

3    of their agency and employment.

4                          **JURISDICTION AND VENUE**

5    9.    The Court is vested with subject matter jurisdiction pursuant to 28

6    U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3729-3732.

7    10.    The Court is vested with personal jurisdiction and venue is appropriate

8    because Defendants have at all pertinent times actively transacted business within,

9    *inter alia*, the Southern District of California, and certain of the acts and omissions

10    alleged in this complaint have been committed by Defendants within, *inter alia*, the

11    Southern District of California.

12                              **RELEVANT LAW**

13    11.    The FCA imposes liability on any person or corporation that "knowingly

14    presents, or causes to be presented, a false or fraudulent claim [to the U.S.

15    government] for payment or approval," that "knowingly makes, uses, or causes to be

16    made or used, a false record or statement material to a false or fraudulent claim" paid

17    or approved by the U.S. government, or that conspires to do the same.  31 U.S.C.

18    § 3729(a)(1).  The FCA provides that any person or corporation that knowingly

19    engages in such conduct is liable to the U.S. government not only for civil penalties,

20    but also for three times the amount of damages sustained by the government.  *Id.*

21    12.    The FCA further provides that any person with direct and original

22    knowledge of a violation of section 3729 may bring an action on behalf of the U.S.

23    and obtain a share of any damages and civil penalties recovered by the U.S.  Pursuant

24    to the FCA, the complaint "shall be filed in camera, shall remain under seal for at

25    least 60 days, and shall not be served on the defendant until the court so orders."  31

26    U.S.C. § 3730(b)(2).  As noted above, a copy of the complaint and written disclosure

27    of substantially all material evidence and information the person possesses shall be

28    served on the government pursuant to Rule 4 of the Federal Rules of Civil Procedure,

1    and the government may elect to intervene and proceed with the action within 60 days

2    after it receives both the complaint and the material evidence and information. *Id.*

3                              **GENERAL ALLEGATIONS**

4                                  **A. Summary**

5        13.   As set forth below, it appears that Defendant SLS has applied for and

6    received, as prime contractor, contracts potentially worth more than $1.4 billion

7    relating to the Border Wall Projects, each of which involves construction and repair

8    to the so-called "border wall" separating the U.S. from Mexico.  Upon information

9    and belief, Defendant UC has received potentially tens or hundreds of millions of

10   dollars in subcontracts from Defendant SLS relating to the same.

11       14.   Among other things, upon information and belief, and as set forth in

12   more detail herein:

13           a.    Defendants knowingly, and in contravention of the Contracts

14   (defined *infra*) and RFPs (defined *infra*) – which required background investigations

15   and notification to the U.S. government in the event of personnel changes – regularly

16   permitted unvetted workers to work on sensitive job sites in the immediate vicinity

17   of the U.S.-Mexico border.

18           b.    Defendants knowingly, and in contravention of the Contracts and

19   RFPs, utilized, and aided and abetted the use of, armed Mexican nationals to provide

20   security services at sensitive job sites in the immediate vicinity of the U.S.-Mexico

21   border.

22           c.    Defendants knowingly, and in contravention of the Contracts and

23   RFPs, utilized, and aided and abetted the use of, those armed Mexican nationals to

24   unlawfully cross into the U.S. from Mexico, carrying weapons, which is contrary to

25   federal law and to the requirements of the Contracts and RFPs.

26           d.    Defendants knowingly failed to report this illegal activity as

27   required under the Contracts and RFPs, and affirmatively misrepresented to

28   representatives of the U.S. government and others, and urged others to do the same,

1  the presence of armed Mexican nationals on the U.S. side of the border.

2          e.      Defendants retaliated against the Relators when they identified

3  these issues and ultimately refused to cover up the aforementioned activity.

4          f.      Upon information and belief, at least one U.S. government

5  employee of the USACE was aware of or involved in the cover-up, and multiple

6  suggestions were made, including by senior people associated with Defendant UC,

7  that this employee was corruptly receiving benefits from Defendant UC.

8          g.      At least two employees of Defendant UC told Relator-1 that UC's

9  President, and at least one other senior UC employee, were knowingly and unlawfully

10 submitting false claims to, and thereby overcharging, the U.S. government.  One of

11 those UC employees ("UC Employee-1")[2] showed Relator-1 a spreadsheet that he

12 explained tracked and illustrated the various false statements and overcharges.

13                **B. Defendants' Involvement in the Border Wall Projects**

14         15.    Defendant SLS serves as the prime contractor for the Border Wall

15 Projects.

16         16.    Upon information and belief, Defendant SLS has applied for and

17 received at least five contracts (the "Contracts") from the USACE related to the

18 Border Wall Projects, potentially valued up to or more than approximately

19 $1,476,881,654:

20

21

22

23

24

25

26

27

28

---

[2] Pursuant to the FCA, 31 U.S.C. § 3730(b)(2), the names of all individuals referenced in this sealed complaint, *inter alia*, have been and/or will be provided to the relevant U.S. government authorities, as required.

| Project | RFP[3] Number | Contract Number | Location | Amount |
|---------|---------------|-----------------|----------|--------|
| CA 14 | W9126G-18-R-0004 | W9126G-18-C-0022 | California | $149,977,118 |
| CA 29 | W9126G-18-R-0098 | W9126G-19-C-0011 | California | $275,642,735 |
| RGV 02 | W9126G-18-R-0093 | W9126G-19-C-0006 | Texas | $167,460,000 |
| RGV 03 | W9126G-18-R-0099 | W9126G-19-C-0005 | Texas | $145,000,000 |
| NM | W9122PP-19-R-0027 | W912PP-19-C-0018 | New Mexico | $738,801,801 |

17. In its role as prime contractor for the Border Wall Projects, Defendant SLS hired a variety of subcontractors to provide services including: (a) design and engineering services, (b) erosion control, (c) construction, and (d) security.

18. As prime contractor, Defendant SLS had multiple responsibilities for the Border Wall Projects, including: (a) prime contract management, (b) design management, (c) construction management, (d) risk management, (e) project quality plan administration, (f) project safety plan administration, (g) procurement and delivery of steel, (h) bonding and insurance, and (i) project security plan administration.

19. In connection with its responsibility for project security, Defendant SLS hired subcontractors to provide security for the Border Wall Projects. Defendant SLS hired the Security Firm to provide security for at least one California-based Border Wall Project, and multiple work sites, each of which was located within the geographic boundaries of the Southern District of California.

20. The Security Firm was, until Defendants ceased using its services in connection with the Border Wall Projects, a subcontractor for the Border Wall Project that concerned the installation and repair of fencing in the vicinity of San Diego, California (Project CA 14; Contract Number W9126G-18-C-0022) (the "San Diego Border Wall Project"). The Security Firm was responsible for: (a) security consultation, (b) developing project security plans, and (c) providing physical

---

[3] "RFP" is short for "Request for Proposal," discussed further below. "RFP Number" is used herein synonymously with "Solicitation ID" number.

1  security.

2  21.   Relator-1 was employed by the Security Firm as Onsite Security
3  Manager for the San Diego Border Wall Project. One of Relator-1's predecessors in
4  that job had been UC Employee-1, who had been hired away from the Security Firm
5  by Defendant UC. As referenced above and discussed in detail below, UC Employee-
6  1 subsequently met with Relator-1 and told Relator-1 about the fraud being
7  committed by Defendant UC.

8  22.   In connection with its responsibility to manage design and construction,
9  Defendant SLS hired subcontractors, including Defendant UC.

10  23.   Defendant UC was responsible for providing a wide variety of services
11  to the Border Wall Projects, including: (a) construction of all low water crossings; (b)
12  construction of all retaining walls; (c) construction of all crossings; (d) construction
13  of all patrol roads and concrete paved roads; (e) demolition and disposal of the old
14  border fence; (f) installation and maintenance of a temporary border fence; (g)
15  excavation and preparation of all foundations; (h) procurement and placement of
16  reinforcing steel; (i) installation of fence panels and gates; (j) procurement and
17  placement of concrete; (k) earthwork cut fill and spoils disposal; (l) performance of
18  geogrid soil reinforcement, rip rap, and shotcrete installation; and (m) construction
19  efforts related to storm water pipes and culverts.

20  24.   In its role, and as required by the RFPs for at least certain of the Border
21  Wall Projects, Defendant UC was responsible for hiring hundreds of properly vetted
22  workers and procuring and transporting various supplies and equipment.

23  **C. The Requirements for the Border Wall Projects**

24  25.   Upon information and belief, each Contract was awarded following a
25  competitive bid process, in which contractors submitted proposals in response to an
26  RFP issued by the USACE. Each such RFP included a host of standards, processes,
27  and procedures relevant to the allegations contained herein, and to which contractors
28  and subcontractors working on the Border Wall Projects were required to adhere.

1    26.    For example, RFP Number W9126G-18-R-0098 ("RFP-1"), for the

2  "Design-Build of California FY18 Primary and Secondary Pedestrian Fence

3  Replacement Project (29 Miles)," and attached as Exhibit 1,[4] contains numerous

4  provisions that specifically address project security.[5]

5    27.    RFP-1 states that "[t]he Contractor must be responsible for the security

6  of its own personnel, equipment, materials, facilities and the worksite, and *must*

7  *comply with any Federal, State, and municipal laws, codes, and regulations*

8  applicable to the security measures deemed required by the Contractor, up and until

9  the Government takes possession of the construction." *Id.* at 10 (emphasis added).[6]

10    28.    Particularly relevant here, RFP-1 contains numerous provisions

11  concerning personnel screening:

12       To facilitate the screening and checking of each employee
        entering in or working on the project sites, the Contractor

13

14  [4] RFP-1 relates to the Border Wall Project described herein as CA 29 (Contract

15  Number W9126G-19-C-0011).  The San Diego Border Wall Project, described in
   detail herein, is CA 14 (Contract Number W9126G-18-C-0022).  Upon information

16  and belief, the relevant provisions are similar or identical between the RFPs for these

17  two Border Wall Projects.  Specifically, upon information and belief, the provisions
   of the RFP associated with CA 14, like the provisions of RFP-1 associated with CA

18  29, would have required vetting of security personnel and would have prohibited

19  Defendants from employing Mexican nationals to illegally cross the border armed
   with weapons.

20
   [5] RFP-1 provides the following regarding the associated project's scope: "Provide all

21  design, labor, equipment and materials required for construction of approximately 15

22  miles of primary new bollard fences and approximately 14 miles of new San Diego
   County (SDC) secondary bollard fences including the New River pedestrian bridge,

23  gates, drainage improvements, communications cable, demolition and disposal, in

24  accordance with the Contract documents.  Provide bollard fences and other project
   features, complete and ready for use, to facilitate the United States Border Patrol's

25  (USBP) mission to gain, maintain, and extend control of the U.S./Mexico Border."

26  *Id.* at 5; *see also infra* n.6.

27  [6] RFP-1 page numbers provided herein relate to page numbers within Section 01 11

28  00 of RFP-1.

must submit Personnel Screening Data along with a black and white photograph accompanying each employee[']s name. . . .

The Contractor must be responsible for submitting an initial list of all personnel required at the jobsite for verification by Border Patrol prior to the NTP being issued.  This includes all drivers for equipment and material deliveries. Any personnel that needs to be added after initial submission must be cleared before accessing the site. Activities include, but are not limited to: site investigations, surveys, and construction.  No employee must be allowed on site until screened and checked for criminal history and proper immigration status.  Any personnel having questionable history/backgrounds will be rejected and not authorized to enter the jobsite.  The Personnel Screening Data must be submitted to the Contracting Officer for forwarding to Border Patrol personnel. . . .  Verification by Border Patrol will be completed no more than 5 days after submittal. . . .

The Contractor must notify the Contracting Officer within five (5) working days of staffing changes.

> 1.  New employees: provide the informat[i]on listed.
>
> 2.  Departing Employees: Provide the name, position title, and security clearance level held by or pending for the individual."

*Id.* at 10-11.

[The Contractor must e]nsure that all employees and subcontractors assigned to the project sites have a criminal background and immigration status check performed and are properly vetted prior to entering the project sites. Employees and subcontractors must display company picture ID badges complete with ID numbers and company logos, for easy identification by Border Patrol agents.  Any personnel not passing vetting procedures will be rejected and will not be authorized to enter the project sites. Vehicles must be conspicuously marked with Contractor identification.

*Id.* at 12.

29.  Also, critically, the RFP contains provisions specifically addressing interactions with Mexican entities and movement across the U.S.-Mexico border:

*No direct coordination with Mexican entities will be permissible.*

1  *Id.* at 13 (emphasis added).

2          At no time will Contractor personnel, equipment, or
        materials cross the international boundary line into Mexico.

3  *Id.* at 7.

4

5      30.     In addition, RFP-1 contains provisions addressing the contractor's

6  reporting requirements:

7          Local law enforcement and/or Border Patrol must be
        contacted to respond in the event of a law and/or border
8        enforcement issue. . . .

9          If the Contractor deems that a change to the Contract
        occurred due to delays caused by security threats of third
10       parties, or due to responses required by the Contractor to
        perceived threats or hazards, it must promptly notify the
11       Contracting Officer of such delay and/or of the Contractor
        deemed change.

12  *Id.* at 10.

13

14     31.     RFP-1 also requires the contractor to submit various ongoing progress

15  reports to the USACE, including "partial pay estimates every month," "[p]roject

16  schedule narrative and earnings monthly update reports," "[v]arious report(s) as

17  specified in 01 35 26 GOVERNMENTAL SAFETY REQUIREMENTS," "Quality

18  Control Reports," "[c]ertified payrolls," and "Earned Value Reports." *Id.* at 29.

19     32.     Finally, RFP-1 requires the contractor to prepare a detailed "Security

20  Plan":

21          As part of the security requirement, the Contractor must be
        responsible for the development and submittal of a Security
22       Plan.  The plan must address procedures in the event of
        aggression or threats from third parties on either side of the
23       international border, to include, 'fall back positions',
        evacuation routes and methods, a muster area and
24       medical/first aid.  This plan must be reviewed by the
        Contracting Officer prior to construction activities or
25       implementation of any change after construction start.  The
        detailed Security Plan must follow all Federal, State, [and]
26       local laws in responding to safety and security threats.

27  *Id.* at 10.

28

1  Security must be maintained throughout the entire contract
2  performance period.  Implement methods and procedures
   to ensure border security at all times.  Install temporary
3  fencing to close-off all gaps resulting from existing fence
   demolition.

4  *Id.* at 17.[7]

5  33.  Upon information and belief, each of the RFPs associated with the

6  Border Wall Projects contains materially similar provisions to those discussed above.[8]

7  34.  The Security Plans required under the RFPs also contain additional

8  relevant requirements regarding project security and personnel vetting.

9  35.  The Security Plan for the San Diego Border Wall Project, for example,

10  attached as Exhibit 2, contains the following provisions that reiterate the need to limit

11  access to Border Wall Project sites, appropriately screen and vet personnel, abide by

12  all federal, state and local laws, and report any security-related incidents to the

13  appropriate authorities:

14

15

16

17  [7] RFP-1 also includes the following provisions:

18
   [The Contractor must e]nsure all personnel employed on the
19  construction site become familiar with and obey construction regulations
   including safety, fire, traffic, and security regulations.  The Contractor
20  must also ensure all personnel keep within the limits of its designated
   worksite and avenues of ingress and egress.  Ingress and egress of
21  Contractor vehicles at the construction site is limited to the Contractor's
   gate.  Hard hats must be worn in designated areas.  No personnel must
22  enter any restricted areas unless required to do so and until cleared for
   such entry.  The Contractors['] equipment must be conspicuously
23  marked for identification.

24  *Id.* at 11.

25  [8] For example, the other RFP currently in the possession of Relators, RFP Number
26  W9126G-18-R-0093, associated with what is described herein as Project RGV 02,
   contains  analogous  provisions  addressing  the  contractor's  security-related
27  requirements, personnel vetting, and the preparation of a Security Plan.  *See also*
28  *supra* n.4.

1
2
3
4

By implementing a 4□tier approach, the contractor has created and will implement a plan to prevent, hinder, halt, and report incidents in order to maintain a safe working environment and fluid construction schedule.    The contractor will do so by implementing this security plan to mitigate realistic security concerns.

*Id.* at 1.

5
6
7
8
9
10
11

All personnel intending to work on the project will be pre□ screened by US Customs and Border Patrol. Personnel with questionable history/backgrounds as determined by CBP will not be authorized to work on the project and not issued a 'Contractor Badge'. . . . A list of pre□screened, approved personnel will be maintained by the SLS Project Team. Once personnel have been pre□screened, a 'Contractor Badge' will be created for each employee/contractor to be worn on the project during working hours. . . . This process will be controlled by SLS via direct coordination with [the Security Firm] senior leadership to minimize disruption to construction operations.

12 | *Id.* at 5-6.

13
14

Access to the site will be restricted.    Only Contractor related vehicles will be allowed access. . . . An inventory of active Contractor vehicles will be kept on file.

15 | *Id.* at 6.

16

Security Guards will obey all Federal, State and Local laws.

17 | *Id.* at 7.

18
19
20
21

Personnel access to the site will be restricted.    Only authorized personnel will be allowed access.  Contractor Badges will remain in possession of the employee at all times and be worn in a visible location while anywhere inside the secondary fence.  Contractor Badges must be presented to any CBP personnel or other Contractor personnel upon request.

22 | *Id.* at 8.

23
24

*If a 'border crossing' is suspected, detected, or witnessed by any construction personnel, CBP will be notified immediately to investigate and/or resolve the matter.*

25 | *Id.* at 12 (emphasis added).

26
27
28

In the event of an incident, the guard, crew, or person witnessing the incident will promptly notify the Superintendent/PM/SSHO who will notify CBP or local authorities.    Security will notify Contractor as well of incident.

*Id.* at 14.[9]

36.     The Security Plan for the San Diego Border Wall Project also states that "the contractor will utilize the services of a private security company to augment the contractor's security posture during working and non☐working hours as needed," and that "[t]he guard force selected, uniforms worn, and lethal self☐defense measures will be vetted and approved by Customs and Border Patrol prior to entering site." *Id.* at 7. The Security Plan goes on to list the Security Firm as "[t]he fixed☐site security company utilized for armed and unarmed, patrolling guards during non☐working hours," but it makes no mention of any other security company.

37.     The Security Plan attaches a Security Plan Addendum, which again references only the Security Firm, and which states clearly that "no guard will be allowed to work on site without going through the proper vetting procedure."

38.     Upon information and belief, in applying for and accepting the Contracts, Defendant SLS covenanted and agreed to adhere to all requirements set forth above.   Similarly, upon information and belief, in connection with being retained as a subcontractor on the Border Wall Projects, Defendant UC agreed to the same.   Furthermore, upon information and belief, Defendants continued to certify their ongoing compliance with these requirements in connection with the various ongoing progress reports Defendants were required to provide to the USACE and others.   As set forth below, Defendants failed to comply with various of the requirements set forth in the RFPs and related documents, and Defendants' promises, agreements, and certifications to the contrary were false.

---

[9] The Security Plan also contains provisions strictly governing the use of firearms, *id.* at 9, and providing an Emergency Action Plan for, among other things, incidents involving active shooters, *id.* at 10-11.

**D. <u>Suspicions of Misconduct Related to the Border Wall Projects, and</u>**
**<u>Suspicions of an Inappropriate Relationship</u>**
**<u>Between Defendants and the USACE</u>**

39.     In the course of his work on the San Diego Border Wall Project, Relator-1 was personally exposed to a variety of information that indicated that an employee of the USACE with supervisory responsibility over certain of the Border Wall Projects ("USACE Employee-1") had an inappropriate relationship with the President of Defendant UC (the "UC President"), which seemingly involved corrupt payments and potential bribery.

a.     The UC President repeatedly socialized with USACE Employee-1, including by taking USACE Employee-1 to golf outings and expensive dinners.

b.     Employees of Defendants claimed that USACE Employee-1 was going to leave the USACE and that the UC President would then provide USACE Employee-1 with a job at Defendant UC.

c.     Relator-2 was told by a senior SLS employee that USACE Employee-1 approved unlawful and impermissible practices engaged in by Defendants, including the repeated allowing of unvetted, armed Mexican nationals to cross the border into the U.S. in order to purportedly provide security at certain Project sites. In addition, other employees of Defendants repeatedly suggested that USACE Employee-1 was corruptly involved in other prohibited practices.

d.     When Relator-1, or other employees of the Security Firm, raised concerns about Defendants to USACE Employee-1, USACE Employee-1 would tell Relator-1 or the Security Firm employees to, in sum and substance, "stand down" and that USACE Employee-1 would address those concerns in the future, though those issues were typically left entirely unaddressed.

40.     On or about July 31, 2019, there was a meeting involving Defendant SLS, Defendant UC, USACE Employee-1 and both Relators, among others.

a.     In the course of that meeting, one topic of discussion regarded a

QUI TAM RELATORS' FALSE CLAIMS ACT COMPLAINT

1 potential change to certain terms of the Contract.

2       b.    One of the participants in that meeting stated, while laughing, in
3 sum and substance, "everyone knows that [requested change] can't happen until
4 [USACE Employee-1] takes his cut" – purportedly suggesting, in a joking way, that
5 the UC President was making corrupt payments, *i.e.*, bribing, USACE Employee-1.

6       c.    Relator-2 was seated to the immediate right of the UC President.
7 When this comment was made, USACE Employee-1, who was sitting approximately
8 fifteen feet in front of Relator-2, immediately turned around to look at the UC
9 President and smiled at him.

10       d.    Relator-1 was seated to the immediate right of Relator-2 (and thus
11 two seats to the right of the UC President) and witnessed the same reaction by USACE
12 Employee-1.

13       e.    At the time, each Relator interpreted the silent exchange between
14 USACE Employee-1 and the UC President to be consistent with an admission of guilt
15 (and not, for example, a joke between the UC President and USACE Employee-1).

16       f.    During the meeting, and immediately after this occurred, Relator-
17 1 sent a text message to Relator-2 to share his suspicion – in that moment and
18 informed by years as a sworn law enforcement officer – regarding the exchange.
19 Relator-2 responded, sharing the same suspicion, also informed by years as a sworn
20 law enforcement officer.  That text message, sent moments after these events, and the
21 response, read as follows:

22             Wednesday, July 31, 2019; 2:56 p.m.

23     [Relator-1]: Please tell me you saw [USACE Employee-1]
    when someone said "[USACE Employee-1] has to take his
24     cut."

25     [Relator-2]: I did[.]  And I thought the same thing.

26       g.    Later that day, a number of SLS employees shared, in Relator-1's
27 presence, their collective belief that there was unlawful activity taking place related
28 to the Border Wall Projects, but that there was, in sum and substance, "nothing that

1 can be done about it," since the people involved were in positions of authority vis-à-
2 vis the Border Wall Projects.

3 **E.    The Unlawful Use of Unvetted, Armed Mexican Nationals to Unlawfully**
4 **Cross the Border into the U.S., While Armed, to Provide Security to Certain**
5 **Border Wall Project Sites, in Violation of Border Wall Project Requirements**

6                                   Introduction

7       41.    As set forth in more detail below, senior employees of Defendants knew
8 of the use of unvetted, armed Mexican nationals to cross the border and purportedly
9 provide security at certain Project sites.

10            a.    SLS's Project Manager for the San Diego Border Wall Project
11 (the "SLS Project Manager") knew about the use of armed Mexican nationals to
12 unlawfully cross the U.S.-Mexico border.  The SLS Project Manager also knew that
13 such guards, among other Border Wall Project workers, were not being vetted as
14 required.

15            b.    SLS's Division President (Federal Services), who was the
16 manager for the Border Wall Projects collectively (the "SLS Federal Division
17 President"), was aware that Defendant UC was using armed Mexican guards, and that
18 such guards, among others, were not being properly vetted as required.

19            c.    Defendant UC's leadership, including the UC President, knew
20 about the use of armed Mexican nationals to unlawfully cross the U.S.-Mexico
21 border.

22            d.    Defendant UC constructed a dirt road that would allow access
23 from the Mexican side of the border into the United States, according to UC
24 Employee-1.  As described in detail below, this UC-constructed road was apparently
25 the route by which the armed Mexican nationals were unlawfully crossing into the
26 United States.

27       42.    Such conduct was in direct violation of the Border Wall Project
28 requirements set forth above, as well as federal immigration and firearms laws.

1    43.    Furthermore, and as also set forth in more detail below, these same
2    senior employees of Defendants, and others, attempted to hide this misconduct.

3         a.    The security protocol established by the SLS Project Manager in
4    or about early April 2019 required that security incident reports, including those
5    written by the Security Firm, be sent first to Relator-2, who would then be responsible
6    for reviewing them and sending them on to a group of employees of the USACE
7    (including, but not limited to, USACE Employee-1).

8         b.    Prior to this, the security incident reporting protocol entailed the
9    Security Firm sending the incident reports directly to the USACE. Defendant SLS
10   was apparently unhappy that one such report prepared by a predecessor of Relator-1
11   (sent directly from the Security Firm to the USACE) was, in sum and substance,
12   "dramatized," and therefore, as set forth immediately below, the protocol was
13   changed to require the incident reports to be sent to Relator-2.

14        c.    Between in or about mid-April 2019 and late June 2019,
15   consistent with this protocol, security incident reports (unrelated to the evident use of
16   armed Mexican-national guards) prepared by the Security Firm were sent to Relator-
17   2, who reviewed them and sent them to the USACE.

18        d.    Beginning in July 2019, however, as set forth in more detail
19   below, and in direct contravention of this established protocol, the SLS Project
20   Manager repeatedly pressured Relator-2 not to disclose to the USACE the discovery
21   of the use of the Mexican-national guards on the U.S. side of the border.

22        e.    USACE Employee-1 was also involved in broader efforts to
23   suppress reporting of the use of these armed guards.

24        f.    After the use of these guards was nevertheless disclosed to the
25   USACE, an employee of an engineering firm involved in the San Diego Border Wall
26   Project informed Relator-2 that she – intentionally or unintentionally – and Defendant
27   SLS would falsely claim that the individuals were not, in fact, guards, but were
28   purportedly criminal elements, and that they were present on the Mexican side of the

1  border, not the U.S. side.

2      g.    Relator-2's contract with Defendant SLS was eventually
3  terminated, which was, upon information and belief, a consequence of Relator-2's
4  refusal to abide by Defendant SLS's direction that he not report to the USACE a
5  security incident apparently involving Mexican-national guards.

6      *July 2, 2019 Incident Involving Armed Mexican Guards on the*
7      *U.S. Side of the Border Claiming to Work for the Security Firm*

8      44.    On or about July 2, 2019, an employee of the Security Firm was notified
9  by a U.S. Border Patrol agent that the agent had discovered two vehicles (one with
10 Mexican license plates) and two men on the U.S. side of the border, who were falsely
11 claiming to be guards employed by the Security Firm.

12     45.    Relator-1, in his capacity as the Onside Security Manager for the San
13 Diego Border Wall Project, responded to the location.

14     46.    Soon thereafter, USACE Employee-1 informed an employee of the
15 Security Firm that the guards belonged to Defendant UC and that the Security Firm,
16 in sum and substance, "should not worry about it."

17     47.    Another Security Firm guard informed Relator-1 that the guard had, for
18 several weeks, observed the presence of the Mexican guards on the U.S. side of the
19 border.

20     48.    That guard also took photographs of the men and the vehicle located on
21 the U.S. side of the border, which he subsequently provided to Relator-1.  Those
22 photographs include:

23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22



23
24
25
26
27
28



49. Relator-1 prepared an incident report concerning this incident, which he provided to Relator-2. *See* Exhibit 3.

50. Relator-2 and the SLS Project Manager had a telephone call shortly after this incident, in which they discussed the incident.

    a. During that call, the SLS Project Manager acknowledged that armed Mexican guards were being utilized on the U.S. side of the border.

    b. The SLS Project Manager further told Relator-2 that USACE Employee-1 had authorized this use of the armed Mexican guards.

    c. Relator-2, as a former FBI Supervisory Special Agent trained and experienced in the parameters and enforcement of federal law, told the SLS Project Manager that USACE Employee-1 could not possibly have the authority to approve Mexican nationals unlawfully crossing the border into the U.S., carrying weapons, in order to provide security to a project to construct a border wall between the U.S. and Mexico.

    d. The SLS Project Manager reacted angrily to Relator-2's statement, and yelled, in sum and substance, "What are you going to do about it?"

    e. The SLS Project Manager further directed Relator-2 not to

1   distribute the incident report prepared by Relator-1 to the USACE, and instead to send

2   it to the SLS Project Manager only.

3           f.     This direction to send the incident report only to the SLS Project

4   Manager was counter to the security protocol established and utilized previously,

5   pursuant to which Relator-2 reviewed incident reports and forwarded them to, *inter*

6   *alia*, a group within the USACE.

7       51.    Soon thereafter, in an email sent by Relator-2 to the SLS Project

8   Manager in which Relator-2 distributed the report only to the SLS Project Manager

9   per the SLS Project Manager's request, Relator-2 wrote: "[A]ttached is the Incident

10   Report from today regarding the two individuals claiming to be [Security Firm]

11   security guards. Per your request, I'm only sending this to you rather than the whole

12   distribution, please let me know if you'd like me to send it out to everyone."

13       52.    In a subsequent phone call between Relator-2 and the SLS Project

14   Manager, the SLS Project Manager directed Relator-2 not to raise this incident at an

15   upcoming regular staff meeting that included between thirty and forty employees of

16   Defendants, the USACE, and others involved in the San Diego Border Wall Project.

17   In that same call, the SLS Project Manager also directed Relator-2 not to further raise

18   the incident with the USACE.

19       53.    Subsequently, another employee of the Security Firm told Relator-2 that

20   USACE Employee-1 had stated that this incident was closed and should not be further

21   discussed.

22            *July 23, 2019 Shooting Incident Involving Armed Mexican Guards on the*

23                  *U.S. Side of the Border Claiming to Work for the Security Firm*

24       54.    About three weeks later, on or about July 23, 2019, Relator-2 received a

25   report regarding the exchange of gunfire on the U.S. side of the border, evidently

26   between, on the one hand, the armed Mexican security guards utilized by Defendant

27   UC and, on the other, Mexican nationals who apparently crossed the border to steal

28   property.

55.     Approximately nine hours after the exchange of gunfire, Relator-1, in his capacity as the Onsite Security Manager for the San Diego Border Wall Project, interviewed a witness, an employee of Defendant UC ("UC Employee Witness") who had spoken with one of the armed Mexican national security guards, regarding the shooting.  The UC Employee Witness stated that the exchange of gunfire occurred on the U.S. side of the border and apparently involved the Mexican security guards utilized by Defendant UC.

56.     Relator-1 prepared an incident report and sent it to Relator-2.  *See* Exhibit 4.

57.     On or about July 24, 2019, in contravention of the SLS Project Manager's direction to Relator-2 that Relator-2 not send directly to the USACE the prior report regarding the July 2, 2019 use of armed Mexican nationals on the U.S. side of the border (but consistent with the security protocol that had previously been agreed upon), Relator-2 sent Relator-1's incident report regarding the shooting to, *inter alia*, the entire USACE team.

58.     Within minutes, the SLS Project Manager sent an email to Relator-2, copying, *inter alia*, the SLS Federal Division President, chastising Relator-2 for reporting the incident directly to the USACE.

a.     In that email, the SLS Project Manager wrote: "Please do not submit any report to USACE until one person from SLS has reviewed the report. This is what we reviewed last time.  [This is apparently a reference to the July 2, 2019 direction.]  I will call you shortly."

b.     Relator-2 replied to the SLS Project Manager, also copying, *inter alia*, the SLS Federal Division President, writing:

[SLS Project Manager],

Just to clarify, and for the record, I sent this incident report via the exact same approval process and to the exact same distribution list as the most recent several incident reports.  The list of people copied on the distribution included only people that I had been instructed by yourself and USACE to include.

The only exception among recent incident reports to this process or distribution list was the incident involving the Mexican guards being discovered on the North [U.S.] side of the border [the July 2, 2019 incident described above] (report attached here) that you asked me to send to only yourself (and not the entire distribution list).

59.    A USACE brigadier general apparently learned of the incident as a result of Relator-2's decision to send the report directly to the entire USACE team.

60.    A USACE employee wrote in reference to Relator-2's emailed report of the shooting: "This information is inconsistent with what [the UC President] told us. Someone from our organization [USACE] will be out today at the request of our B[rigadier] G[eneral] to do a full investigation. We need to get an accurate story."

61.    The brigadier general sent an investigator to the San Diego Border Wall Project site the following day to investigate.

62.    Shortly thereafter, in or about late-July 2019, USACE Employee-1 approached Relator-1. USACE Employee-1 asked Relator-1, in sum and substance, why he reported the shooting, and claimed that the shooting had occurred on the Mexican side of the border and was therefore, in sum and substance, "none of our concern."    Relator-1 interpreted USACE Employee-1's confrontation as an "intimidation tactic."

63.    Approximately six weeks later, on or about September 18, 2019, Relator-1 was told that USACE Employee-1 had given two-weeks' notice and would be leaving the USACE due to, in sum and substance, "problems with his boss."

64.    Several hours after Relator-2 sent Relator-1's incident report to the entire USACE team, the SLS Project Manager instructed Relator-1 to conduct a second interview with the UC Employee Witness.

a.    Before Relator-1 could even ask a question during this second interview, the UC Employee Witness unilaterally and without prompting stated that the shooting was on the Mexican (not U.S.) side of the border and that, in sum and substance, "we shouldn't be concerned."

b.      Relator-1 believed that this second statement was untrue and possibly the result of coaching or intimidation, and, as a result, he told the UC Employee Witness that he wanted to review the events again in detail.

c.      When Relator-1 did so, the UC Employee Witness immediately reversed course, and told Relator-1 that – as he had initially reported to Relator-1, and as had been described in the initial report which was disseminated to, *inter alia*, the USACE – the armed Mexican security personnel were, in fact, operating on the U.S. side of the border wall.

65.    Shortly thereafter, Relator-2 participated in a telephone conference call with the SLS Federal Division President and the UC President.

a.      During that call, the SLS Federal Division President and the UC President stated plainly that they were fully aware of the use of the Mexican guards at the San Diego Border Wall Project site.

b.      Specifically, the UC President stated that he is paying for the services of the Mexican guards.

c.      The UC President also stated that he is making payments to citizens of Mexico who reside near the border in order to keep them from stealing equipment and supplies.

d.      The UC President stated that another UC employee, UC Employee-1, handled the interactions with the Mexican guards.

e.      The UC President also stated that the shooting incident should not have been reported to the USACE.

### *Relator-2 Reports This Activity to the FBI*

66.    On or about July 24, 2019, the day after the July 23, 2019 incident, Relator-2 contacted an FBI Supervisory Special Agent – who supervises an FBI public corruption squad that investigates, *inter alia*, border cases – in order to report the above events and his concerns regarding various illegal and potentially corrupt activity involving Defendants.

67.    On or about August 5, 2019, Relator-2 spoke with the same FBI Supervisory Special Agent and detailed the above events to that Agent.  That FBI Supervisory Special Agent referred Relator-2 to a second FBI Supervisory Special Agent, who supervised an FBI squad in San Diego that is responsible for investigating public corruption.

68.    Soon thereafter, Relator-2 engaged in multiple conversations with that second FBI Supervisory Special Agent and an FBI Special Agent on the public corruption squad that the second FBI Supervisory Special Agent led.  Relator-2 also provided to the Agents a package of relevant documents and communications.

*Another Affiliated Firm's Potentially False Statements to*
*Federal Investigators Related to the Border Wall Projects*

69.    On August 31, 2019, an employee of an engineering firm involved in the San Diego Border Wall Project told Relator-2 in a telephone call that Defendant SLS had been requested by the USACE to submit a statement regarding all matters related to the use of the armed Mexican guards.

a.    That employee told Relator-2 that her firm had "clarified" with other witnesses the events described above and that her firm and/or Defendant SLS were planning to tell the USACE: (a) that the individuals observed on the U.S. side of the border on July 2, 2019 were actually criminal elements and not guards; (b) that the Mexican guards never crossed into the U.S. while they were utilized; and (c) that the shooting on July 23, 2019 actually took place on the Mexican side of the border.

b.    Relator-2 responded to that employee via email, writing that "[i]n the interest of making sure that any response to USACE or CBP is as accurate as possible," Relator-2 wanted to ensure that the employee understood that "there are multiple indications that the Mexican guards were on the north [U.S.] side of the border multiple times – at a minimum between July 2 and July 23." Relator-2 further wrote to that employee that:

i.    According to Relator-1's report about the July 2 incident,

1  the Mexican guards explicitly stated that they were, in sum and substance, "[Security

2  Firm] guards", and pointed out that if they were, in fact, "criminal elements," as that

3  employee said, it wouldn't make sense for them to claim to be affiliated with the

4  Security Firm.

5          ii.     Another Security Firm employee explicitly told Relator-2

6  that USACE Employee-1 had "said that they were Mexican guards and that [the

7  Security Firm employee] shouldn't worry about it."

8          iii.    The SLS Project Manager called Relator-2 and asked

9  Relator-2 "not [to] distribute the written incident report to the normal distribution

10  group, but to only send it to him [the SLS Project Manager]." Relator-2 continued

11  that: "If [the SLS Project Manager] didn't think the occupants of the vehicles were

12  [Mexican] guards, I don't know why he would have wanted to stop the distribution

13  of the report." Relator-2 also noted that "[USACE Employee-1] did not want the

14  topic [the July 2 incident] to be discussed" and that "[the SLS Project Manager]

15  specifically called me and told me not to bring it [the July 2 incident] up in [a weekly

16  staff] meeting. If the people in the vehicle were anyone other than the Mexican

17  guards, I don't understand why [USACE Employee-1] and [the SLS Project Manager]

18  wouldn't want it discussed."

19          iv.    Relator-1's report about the July 23, 2019 shooting incident

20  included the interview of the UC employee who said that an armed Mexican guard

21  involved in the shooting "told him [the UC employee] that they [the armed Mexican

22  guards involved in the shooting incident] were on the north [U.S.] side of the border."

23          v.     Relator-2 also wrote that, during that call, the SLS Project

24  Manager "also told me that [USACE Employee-1] was allowing the Mexican guards

25  to work on the north [U.S.] side" of the border. Relator-2 continued, "I expressed my

26  strong concern [to the SLS Project Manager] about [the] USACE essentially

27  participating (technically) in human and weapons smuggling."

28          c.    Relator-2 never received any reply to this email.

*Defendant SLS's Termination of Relator-2*

70.     On or about October 17, 2019, the SLS Project Manager informed Relator-1 that Relator-2 had been relieved of his duties and that, as such, Relator-1 and his firm, the Security Firm, should no longer communicate with Relator-2.

71.     Later that same day, on or about October 17, 2019, Relator-2 spoke on the telephone with Relator-1 and another employee of the Security Firm.

        a.      During that call, Relator-1 told Relator-2 that the SLS Project Manager had told Relator-1 that Relator-2 had been relieved of his duties.

        b.      This was the first time that Relator-2 had been informed of any change to his duties and responsibilities with Defendant SLS.

72.     Approximately ten days later, on or about October 27, 2019, Relator-2 had a conversation with the SLS Federal Division President.

        a.      The SLS Federal Division President informed Relator-2 that Defendant SLS was going to terminate Relator-2's contract early.

        b.      Relator-2 asked the SLS Federal Division President for the reasons why. The SLS Federal Division President suggested that Relator-2 was being terminated because he should have, himself, terminated the Security Firm.

        c.      Relator-2 responded that he had spoken with the SLS Project Manager, Defendant SLS's Project Manager for the San Diego Border Wall Project, who had twice told Relator-2 that, notwithstanding conflicting direction on this issue from Defendant SLS, the Security Firm should not be terminated.

        d.      The SLS Federal Division President told Relator-2 that the second reason for his early termination was that Relator-2 was not physically based at the Border Wall Project sites (notwithstanding the fact that from the beginning, there was an understanding that Relator-2 would not be based at the Project sites).

**F.  The Use of Unvetted Construction Personnel, in Violation of Border Wall Project Requirements**

73.     Upon information and belief, the use of unvetted personnel was not

1 limited to the use of armed Mexican-national guards.

2     74. Roughly once per month, is his capacity as the Onsite Security Manager,
3 Relator-1 conducted a surprise audit of construction personnel at the San Diego
4 Border Wall Project sites to ensure that personnel were in possession of personal
5 identification, as required under the RFPs and the Security Plan. Each time, many of
6 the personnel working for Defendant UC were found not to have identification on
7 their persons, as required. Relator-1 was informed by another former employee of
8 the Security Firm that he had also routinely encountered such non-compliance with
9 identification requirements during audits that he had conducted on a nearly daily
10 basis.

11     75. Subsequent to each visit, Relator-1 documented the names of Defendant
12 UC's construction personnel physically present at the San Diego Border Wall Project
13 sites (in the immediate vicinity of the border) without identification, and cross-
14 checked those names against the master database that he maintained – and which he
15 was required to maintain, as set forth in the RFP and the Security Plan – of all vetted
16 and approved personnel.

17     a. Pursuant to the RFP and the Security Plan, contractors and
18 subcontractors were required to provide Relator-1 with various personal information
19 for any proposed construction personnel.

20     b. Relator-1 was then required to send this information to U.S.
21 Customs and Border Protection ("CBP"), which would screen and vet the proposed
22 individuals.

23     76. Relator-1's cross-checks indicated that many of Defendant UC's
24 construction personnel physically present without identification at the San Diego
25 Border Wall Project sites (in the immediate vicinity of the border) were not included
26 in the database at all – let alone successfully vetted and approved, as required by the

27

28

1 │ RFP and presumably required by the Contract.[10]

2 │      a.    Relators were also aware that the UC President's sons had, on
3 │ various occasions, worked at the Border Wall Project sites, despite having never been
4 │ vetted or approved.

5 │      b.    Relator-2 was also informed by an executive of another entity
6 │ working on one of the Border Wall Projects that the executive had been informed by
7 │ an SLS manager that that SLS manager suspected that the use of unvetted personnel
8 │ on that Border Wall Project was common.

9 │      c.    Relator-2 was further informed by this same executive that, on
10 │ days in which audits were conducted at Border Wall Project sites – the audits would
11 │ include verification that Defendants and other subcontractors were using only vetted
12 │ workers, as required by the contracts – an SLS manager would announce the
13 │ forthcoming audits in advance and multiple workers would not show up to work on
14 │ the day of that announced audit.

15 │      d.    Similarly, Relator-1 was instructed by the SLS Project Manager
16 │ to email out notifications in advance of such audits.

17 │     77.    Relator-1 was also informed by another employee of the Security Firm
18 │ about allegations that UC workers at one or more of the Border Wall Project sites had
19 │ actively assisted other individuals to unlawfully cross the border into the United
20 │ States, including by reportedly positioning construction vehicles in such a way as to
21 │ obstruct U.S. government cameras to facilitate illegal crossing.

22 │     78.    Upon information and belief, many of the construction workers offered
23 │ by Defendants for screening and approval did not meet CBP's criteria. As a result,
24 │ proposed workers failed to pass the screening process at a relatively high rate.

25 │
26 │ ────────────────
27 │ [10] A comparison of Defendants' payroll records against the Security Firm's database
   │ of vetted individuals would confirm the full extent to which Defendants utilized
28 │ unvetted personnel.

79.   Upon information and belief, Defendant SLS repeatedly attempted to pressure CBP to relax its screening requirements, in order to reduce the rejected rate.

80.   Despite such attempts, upon information and belief, Defendants became frustrated by the relatively high rejection rate, and utilized unvetted personnel in violation of the personnel screening process required under the RFPs and the Security Plans.

## G. **The Apparent Submission of Fraudulent Invoices**
### **Related to the Border Wall Projects**

81.   On November 27, 2019, Relator-1 had a meeting with UC Employee-1, the UC employee who, as described above, was evidently responsible for coordinating with the armed Mexican guards.

a.   UC Employee-1 worked closely with the UC President, in Defendant UC's front office.

b.   Relator-1 and UC Employee-1 met in Defendant UC's office trailer at one of the San Diego Border Wall Project sites.

82.   Towards the beginning of the conversation, unprompted by anything Relator-1 said, UC Employee-1 volunteered that Defendant UC was involved in seemingly large-scale fraud and overcharging, including the making of false claims related to the Border Wall Projects.

83.   UC Employee-1 stated that when there is a new RFP or a change made to the work, the UC President would instruct UC Employee-1, in sum and substance, "to make it cost [this] much."

84.   Relator-1 interpreted this as indicative of fraud because, rather than employing actual costs and expenses, the UC President was inventing costs to reach an amount the UC President had apparently pre-determined.

85.   UC Employee-1 further stated, in sum and substance, that the UC President was "hid[ing]" the full extent of his profits on the Border Wall Projects.

86.   UC Employee-1 described this conduct, in sum and substance, as "the

1   crooked part."

2       87.    UC Employee-1 specifically stated that the UC President was submitting
3   false claims for diesel fuel.

4       88.    When Relator-1 pushed back and said to UC Employee-1, in sum and
5   substance, that "you have to put diesel in all the vehicles," UC Employee-1 responded
6   rhetorically, in sum and substance, "you think we're going to [use] that many
7   gallons?"

8       89.    Pointing to a spreadsheet that UC Employee-1 had shown Relator-1, UC
9   Employee-1 said, in sum and substance, "2,880 gallons?   You know how many
10  gallons I order per week?  1,000." He continued, in sum and substance, "We don't
11  fucking use that much diesel."

12      90.    At one point in the midst of this conversation regarding diesel fuel, UC
13  Employee-1 abruptly stopped speaking, and said to Relator-1 that he thought he had
14  heard someone entering the trailer while UC Employee-1 was showing Relator-1 the
15  spreadsheet and explaining the UC President's apparent fraud.

16          a.    UC Employee-1 exclaimed, in sum and substance, "Fuck.  I
17  thought somebody walked in."

18          b.    Relator-1 reassured UC Employee-1 not to worry, and that he
19  would have seen someone walking into the UC trailer where they were then speaking.

20      91.    UC Employee-1 then continued to explain the apparent fraud involving
21  the diesel fuel. UC Employee-1 gave an example, pointing out that if they were using
22  a forklift, they would use it only sporadically throughout the day but charge the
23  government for fuel, in sum and substance, "as if it was running all the time."

24      92.    When Relator-1 again challenged UC Employee-1 about these practices,
25  he claimed, in sum and substance, that "it is just the cost of doing business."

26      93.    UC Employee-1 also informed Relator-1 of an incident that occurred
27  shortly after UC Employee-1 began employment at Defendant UC (after being hired
28  by Defendant UC directly from the Security Firm).

       a.     UC Employee-1 stated that when UC-Employee 1 approached the UC President about getting a certification for an equipment operator, the UC President laughed and said, in sum and substance, "you're new around here, aren't you."

       b.     The UC President then turned around, opened a filing cabinet and provided UC Employee-1 a blank certificate to be completed with the operator's name.

       c.     Such certifications are, of course, not provided by employers, and the clear implication – and UC Employee-1's interpretation – was that the UC President was using a fake certification.

94.    Relator-1, due in part to his background as a law enforcement officer, immediately recognized the significance of UC Employee-1's admissions – particularly in conjunction with the other information described herein – as potentially relating to serious criminal activity, including potential fraud and bribery.

95.    In consequence, shortly after this conversation with UC Employee-1, on or about November 27, 2019, Relator-1 informed Relator-2 about the conversation, and Relator-2 informed the FBI Special Agents with whom he had previously been speaking about this activity.

96.    Shortly thereafter, in or about late-November 2019, an FBI Special Agent called Relator-1 to discuss his allegations. They met, along with a second FBI Special Agent, soon thereafter. During that meeting, Relator-1 shared the information discussed herein.

97.    On or about December 4, 2019, approximately a week after this conversation with UC Employee-1, and approximately five weeks after the termination of Relator-2's contract by Defendant SLS, the SLS Project Manager informed Relator-1 that the Security Firm's contract would also be terminated.

# COUNT I

## VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)

98.    Relators restate, replead, reallege, and incorporate by reference the contents of paragraphs 1 – 97 as though fully set forth herein.

99.    Based upon the foregoing, Defendants knowingly presented, or caused others in their employ to present false or fraudulent claims for payment or approval – or acted with deliberate ignorance or reckless disregard of the truth or falsity of the same – to an officer or agent of the United States, specifically officers or agents of the USACE.

100.    Furthermore, Defendants knowingly made or used, or caused others in their employ to make or use, false records or statements material to false or fraudulent claims for payment or approval – or acted with deliberate ignorance or reckless disregard of the truth or falsity of the same – submitted to officers or agents of the USACE.

101.    On the basis of the foregoing, the United States is entitled to three times the amount by which it was damaged, to be determined at trial, plus a civil penalty for each false claim presented or caused to be presented.

## PRAYER FOR RELIEF

102.    WHEREFORE, Relators respectfully request that this Court enter judgment in favor of Relators and against Defendants, as follows:

    a.    That the United States be awarded damages in the amount of three times the damages sustained by the United States due to the false claims alleged in this complaint.

    b.    That civil penalties be imposed for each and every false claim that Defendants caused to be presented to the government.

    c.    That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses that Relators necessarily incurred in bringing and pressing this case.

1    d.  That Relators be awarded the maximum amount allowed pursuant

2 to the FCA.

3    e.  That this Court award such other and further relief as it deems just

4 and proper.

5           **DEMAND FOR JURY TRIAL**

6    103. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators

7 demand a trial by jury.

8

9 DATED: February 5, 2020    KRIEGER KIM & LEWIN LLP

10              NICHOLAS J. LEWIN

11              JONATHAN L. BODANSKY

12

13              SCHEPER KIM & HARRIS LLP

               MARC S. HARRIS

14              MIRANDA LIEVSAY

15              By:

16

17

18              Marc S. Harris

               Attorneys for Relators

19

20

21

22

23

24

25

26

27

28